ORDERED in the Southern District of Florida on 03/27/07



_Raymond B. Ray_
Raymond B. Ray, Judge
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
BROWARD DIVISION
www.flsb.uscourts.gov

IN RE:                                              CASE NO: 05-20442 -RBR
                                                    CHAPTER 7
JEFFREY DAPRIZIO,

      Debtor.
_____/

MERRILL LYNCH BUSINESS
FINANCIAL SERVICES, INC.                            ADV. NO.:  05-2094-RBR

      Plaintiff,

v.

JEFFREY DAPRIZIO and
SPORTSPOWER LIMITED,

      Defendants.
_____/

### MEMORANDUM DECISION GRANTING MOTION FOR INVOLUNTARY DISMISSAL

THIS MATTER having come before this Court on the 30th day of November 2006,

on Jeffrey Daprizio's Motion for Involuntary Dismissal Pursuant to Bankruptcy Rule Civil

Procedure 7052(c) (DE 186), and this Court after considering the motion, the response of

ADV. NO.: 05-2094-RBR

the Defendant (DE 195), the evidence presented, the argument of counsel, the demeanor and credibility of the witnesses, and the legal authority presented, makes the following findings of fact and conclusions of law:

## Jurisdiction

This Court has jurisdiction over the parties and subject matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This adversary proceeding is a core proceeding under 28 U.S.C. §157(b) (2)(I) which seeks the determination of the dischargeability of debt owing to the Plaintiff.

## History

The Defendant, JEFFREY DAPRIZIO ("Daprizio" or "Defendant") filed his voluntary petition under Chapter 7 of the Bankruptcy Code on January 28, 2005. The Plaintiff, MERRILL LYNCH BUSINESS FINANCIAL SERVICES, INC., ("Merrill Lynch" or "Plaintiff") is a lending institution doing business in Broward County, Florida, and is a creditor in Daprizio's bankruptcy proceeding.

Merrill Lynch commenced this adversary on May 2, 2005, against Daprizio and Sportspower Limited ("Sportspower"). Sportspower was dismissed from the adversary proceeding on June 23, 2005. All counts on the original adversary complaint have been dismissed with the exception of Count I which seeks determination of debts under 11 U.S.C. §523(a)(2)(A), Count II which seeks determination of debts under 11 U.S.C. §523(a)(2)(B), and Count III which seeks determination of debts under 11 U.S.C. §523(a)(4).

ADV. NO.:  05-2094-RBR

A pretrial order (DE 67) was entered with the consent and agreement of the parties on October 6, 2005.  Trial was originally scheduled for October 26, 2005, but was continued due to Hurricane Wilma and actually commenced on March 8, 2006.  The trial continued over approximately thirteen (13) days until September 29, 2006, at which time the Plaintiff rested its case in chief.

After Plaintiff rested its case, the Defendant announced he was seeking an involuntary dismissal of the complaint and this Court set a scheduling order for consideration of the same.  On October 26, 2006, the Defendant timely filed his Motion for Involuntary Dismissal Pursuant to Bankruptcy Rule of Civil Procedure 7052(c) (the "Dismissal Motion").  The Plaintiff filed its response to the Dismissal Motion on or about November 3, 2006.  On November 30, 2006,  this Court heard argument regarding the Dismissal Motion and set deadlines to consider competing proposed findings of facts and conclusions of law.

After considering the foregoing, the Court concludes the Dismissal Motion should be granted and makes the following findings of fact and conclusions of law.

### Findings of Fact

In 1997, the Defendant started a business with his former wife, Stacy Daprizio ("Wife"), in the name of Sawgrass Trading Company, Inc., ("Sawgrass").  Sawgrass was engaged in the business of the importing and wholesale distribution of sporting goods, candies, and consumer products.  Sawgrass operated in Weston, Florida, and the

ADV. NO.:  05-2094-RBR

Defendant, his Wife, and certain employees were, at various times, officers of the corporation.

In 1999, the Defendant, as officer and director of Sawgrass, obtained a line of credit with Merrill Lynch.  The Defendant and his Wife executed the requisite loan documents on behalf of Sawgrass, as well as personal guarantees.  The line of credit with Merrill Lynch was considered for renewal annually under the terms of the loan documents.  The debt to Merrill Lynch  was secured by a perfected, first secured its interest in virtually all of the assets of Sawgrass.

The loan was renewed and modified in May of 2000, 2001, 2002, and 2003.  In May 2003, in addition to the renewal of the original modified line of credit, Sawgrass was granted a reducing revolver loan of $500,000.00 with Merrill Lynch.   From 1999 through 2003, Sawgrass's business expanded considerably.   The gross sales increased from $4,000,000.00 to about $12,800,000.00 in 2003.   Payments were made until the loans were called by Merrill Lynch in June 2004, for breach of non monetary defaults.

As Sawgrass's operation expanded, so did its number of employees (reaching a peak of about 35), and it set up a full time bookkeeping department.  In the summer of 2002, this department was headed by the Chief Financial Officer Ian Donaldson ("CFO" or "Donaldson").  In his capacity as CFO of Sawgrass, Donaldson oversaw the preparation and maintenance of the financial books and records.  Donaldson's responsibilities included the preparation of necessary internal financial reports and financial records, and assistance in the preparation of the annual statement to be reviewed by an outside accounting firm[1].

---

[1] Merrill Lynch required Sawgrass to hire an outside accounting firm to review the year-end financial statements.

ADV. NO.: 05-2094-RBR

David Wrubel, C.P.A. was hired as the outside certified public accountant to provide the requisite accounting needs of Sawgrass including, but not limited to, the reporting and financial statements required by the Defendant annually and preparing the tax returns.

As Sawgrass expanded, the Defendant's role in accounting matters diminished and he relied exclusively on his CFO and Wrubel to handle all of the accounting needs until March 2004. This is supported by the numerous correspondences in the record between Wrubel and Donaldson, and the testimony of Daprizio and Arthur Velardi.

While year-end financial statements of Sawgrass and Daprizio were introduced into evidence, there is little evidence submitted in support of the allegations asserted by the Plaintiff. The witnesses for the Plaintiff relative to the financial statements were Michael Kozak, Gary Stewart, and William Kocolowski. Stewart and Kocolowski had no involvement in Merrill Lynch's renewal or the granting of credit to Sawgrass. They testified generally as to Merrill Lynch's policies, but could not testify as to what was done specifically with respect to this specific borrower. Their testimony lacked specificity as to what was false in the particular submitted financial statements and what reliance, if any, was placed on them. Thus, their testimony as to the financial condition of Sawgrass and the statements submitted to Plaintiff was not helpful or credible.

Mr. Kozak, who was designated by Merrill Lynch as the person most knowledgeable of the allegations in the complaint, in his sworn deposition in evidence, could not set forth the factual basis upon which the allegations in the complaint were based, especially those which dealt with the financial statements that were the basis of the granting of extensions of credit for the years 1999 through May 2003. Kozak stated the Defendant did not make

–5–

ADV. NO.: 05-2094-RBR

any misrepresentations to him. Kozak did question Sawgrass' financials submitted for the renewal of the loans in May 2004.  However, Merrill Lynch denied the 2004 request for renewal because the year-end financial statements for 2003 reflected a violation of the net worth covenants that were required to be maintained.

It is clear from Kozak's written memorandum in May 2003, and the reviewed financial statement for the year ending December 31, 2002 submitted by Sawgrass in May 2003, that Plaintiff was well aware of the risks of Sawgrass' operation and knew it had previously been  in violation of its covenants.  In fact, the terms of the covenants originally required by Plaintiff when the loans were renewed in May 2003 were modified when Plaintiff subsequently received the reviewed financial statement for the year ending December 31, 2002 of Sawgrass weeks later. The memo written by Michael Kozak, reflects that on May 16, 2003, Merrill Lynch approved the renewal of Sawgrass' credit line in the amount of $1,250,000.00 and approved a new $500,000.00 reducing revolver loan.

Afterward, Sawgrass was required to provide Merrill Lynch with the following documents: (1) individual financial statements; (2) customer reference from Gart Sports Company; (3) copy of Sawgrass's reviewed financial statement for the period ending December 31, 2002; and, (4) updated Certificate of Insurance naming Merrill Lynch as lender loss payee.  All of the foregoing were received by Merrill Lynch in June 2003, and were referenced in the interoffice memorandum. (Exhibit 31 C.) This same memo acknowledged that the net income of Sawgrass on the reviewed financial statement was adjusted down from $565,000.00 to $320,000.00, from the compiled financial statement for year-end December 31, 2002.  The reason for this reduction was due to a bad debt

-6-

ADV. NO.: 05-2094-RBR

expense of $214,000.00 not shown on Sawgrass' compiled statement. Due to this adjustment on the reviewed statement, Merrill Lynch changed the Step Up Total Net Worth that was put in place in May 2003 downward so that Sawgrass would not be in default of the covenant that set the number at $600,000.00.

The Plaintiff's memo also summarizes the risk Plaintiff saw in this loan. First, it states the balance sheet of the borrower is not particularly strong. Next, it notes the owners historically took significant distributions. Third, the borrower's business was concentrated in certain customers. Fourth, the borrower's business is subject to fads and quick changes in demand. Finally, the borrower's business is subject to spike or peak periods, such as, the holidays.

The reviewed financial statement for December 31, 2002, disclosed that Sawgrass was a party to various pending legal actions, claims and assessments. It stated that in the opinion of management based on the advice of its outside counsel, the liability, if any, from all pending litigation would not materially affect the company's financial statement. Thus, Plaintiff was on notice of pending litigation and it was the belief, on advice of outside counsel, that it would have no effect on the financial condition of Sawgrass. There is no evidence that the statements and disclosures were knowingly false when made. In fact, Daprizio and Velardi believed that Sawgrass would win the one significant lawsuit with Quality Collectibles, Inc., but after trial, a judgment was entered against Sawgrass in January 4, 2004.

After the renewal of the credit and the new revolver loan with Plaintiff, Sawgrass' total indebtedness increased to $1,750,000.00. This sum was reduced by approximately

–7–

ADV. NO.: 05-2094-RBR

$500,000.00 as of July 2004 when the Assignment for the Benefit of Creditors was filed, pursuant to the claim filed by Merrill Lynch in the ABC.

The Plaintiff made numerous allegations of improperly handling of the operation of Sawgrass after the May 2003 renewal which it believes should result in this Court determining that Plaintiff's debts against Daprizio are non-dischargeable. This Court finds that the allegations are unfounded and unsubstantiated, nevertheless, the Court will address them.

### Relationship to Sportspower

The Plaintiff asserts that Sportspower received fraudulent transfers from Sawgrass though Defendant's authorization and was improperly given a UCC I regarding its debt in March 2004. The evidence, both written and testimonial, clearly reflects that Sportspower was a major supplier of Sawgrass. Sawgrass owed Sportspower a sum in excess of $1,000,000.00 in March 2004. Donaldson as CFO of Sawgrass and with the authorization of Defendant, executed and filed a UCC 1 in favor of Sportspower in March 2004. This UCC 1 was not supported with a security agreement and any lien attempted to be given to Sportspower was subordinate to Plaintiff's prior, properly perfected lien.

Sportspower did not get any benefit or advantage by the execution and filing of the UCC 1, nor was Plaintiff's interest affected by it since Sportspower did not assert or enforce any security interest in any collateral of the Plaintiff. Sportspower was treated and paid as an unsecured creditor of Sawgrass. It did receive substantial payments in 2003 and 2004, but it also supplied substantial goods to Sawgrass. There is no credible evidence that any of the payments made to Sportspower were anything other than

-8-

payments to a major supplier of Sawgrass.  Sawgrass continued to pay Sportspower in its efforts to continue the relationship in the hope that the business could continue if Merrill Lynch had renewed the loans in June 2004 instead of demanding the full sums due it. In fact, according to Sawgrass' records, Sportspower suffered a substantial loss as it was not paid the sums due it. All of the assets which Sportspower may have asserted an interest in, due to its UCC 1, were abandoned and turned over to Plaintiff. While the arrangement with Sportspower may have been different from other suppliers, this does not make it fraudulent, nor were the payments made to it fraudulent.

The Plaintiff also asserts that Sportspower was an insider, this is not relevant in the context of this adversary proceeding.  If the payments were improper as fraudulent transfers, the proper forum for bringing actions against it would have been in the Assignment for the Benefit of Creditor where seemingly no action was taken by the assignee or Merrill Lynch.  Therefore, in view of the costs of goods which exceeded $10,000,000.00 by Sawgrass  in 2003, the amounts paid to its major supplier are not fraudulent or improper.

## Divorce Proceeding

Daprizio and his wife, Stacy Daprizio, initiated a divorce proceeding on January 9, 2004, in Broward County, Florida.  The marital problems apparently arose from the wife's substance abuse, compulsive spending, and the husband's infidelities.  Forensic accountants were employed, due to the Wife's allegations that Daprizio made improper transfers of monies.  Most of these allegations were reasserted by Merrill Lynch in this case even though the divorce was resolved by a mediated settlement and there was no

ADV. NO.: 05-2094-RBR

evidence submitted that the forensic accountants found any substantiation or conclusive findings as to any of the Wife's allegations.

The Plaintiff produced no expert testimony regarding the allegations made in the divorce proceeding. Plaintiff did produce some financial statements and other documents but most of these items were incomplete, inconclusive and irrelevant to the issues before this Court. The Plaintiff pointed out that in the divorce proceeding Defendant listed his ownership interest in Sawgrass at zero. This is interpreted as Defendant's belief as to what his shareholder interest was worth in the spring of 2004 when there was uncertainty as to the status of the financial records. The divorce proceeding has continued with contested hearings regarding enforcement of support orders, custody and visitation. Substantial animosity exists between the Defendant and his former wife.

Stacy Daprizio testified in this proceeding on behalf of Merrill Lynch. The Court notes that she had reached a settlement with Merrill Lynch in which she was released from the debt with Plaintiff in return for payment of $200,000.00, and an agreement to testify for the Plaintiff in this proceeding. Stacy Daprizio made numerous statements regarding the operation of Sawgrass under her husband's direction which were unsupported and contrary to the sworn statements she previously made in the state court collection action involving Merrill Lynch. In 2004, Merrill Lynch sued both Daprizio's on their note and guarantee of the Sawgrass debt. In that action, Merrill Lynch took the deposition of Stacy Daprizio. She stated, under oath, that she had little involvement in the business and had little knowledge of its operation. This testimony is directly contrary to her testimony at this trial.

ADV. NO.: 05-2094-RBR

In view of the inconsistent testimony, bias and animosity between Ms. Daprizio and the Defendant, the Court finds that Stacey Daprizio's testimony is not credible or believable. Furthermore, Velardi's testimony supports Stacey Daprizio's earlier state court testimony that she had little involvement in Sawgrass' business and operation.

### Infinity Designs and Imports, Inc.

Stacey Daprizio and Merrill Lynch both asserted that Defendant had opened a competing business to defraud Ms. Daprizio and creditors. The business created was Infinity Designs and Imports, Inc. ("Infinity"). This business was incorporated in February 2004. An employee of Sawgrass sent out an email stating that it was going to be operating as a broker for imports for large retailers who want to deal directly with factories.[2]

The Defendant and Mr. Velardi testified that this entity was created not to compete with Sawgrass, but was intended to handle all of the direct import sales to bigger customers like Walmart and Costco, a business they hoped to develop. Neither the business, nor the concept ever got off the ground. There is no evidence of monies or assets of Sawgrass being placed in this entity. The Defendant testified Merrill Lynch was aware of this entity because he had opened an account with Merrill Lynch in the name of this entity. Plaintiff did not deny that such an account existed. There was no credible evidence which would in any way establish that this entity was created by Defendant to defraud Merrill Lynch or the other creditors of Sawgrass. Also, this entity did not impair

---

[2] Defendant claims this email was sent in error or mistake.

-11-

ADV. NO.: 05-2094-RBR

Plaintiff's collateral or impair the assignee of Sawgrass from liquidating the assets of Sawgrass.

### Ian Donaldson, Chief Financial Officer

In March 2004, Defendant was alerted by an employee that there was a problem in the accounting department because checks to a vendor were being returned. Defendant confronted the CFO who was promptly discharged. Defendant immediately contacted the outside accountant to commence an investigation and he later notified the representative at Merrill Lynch to apprise him of the bookkeeping problem and that there would be a delay in the financials, which were due in April 2004 for consideration of the May 2004 annual review. Daprizio instructed Wrubel, Velardi, and other employees to investigate the bookkeeping problems. He further told them to do everything necessary to correct the situation and ensure that the financials were completed in as timely manner as possible since the year-end financial statement was due to Plaintiff and the annual renewal was coming up in May 2004.

After the investigation, it was discovered that the CFO had booked certain receivables in advance of sales at year-end 2003 and the first quarter of 2004, which gave an improper book value to the receivables. Donaldson took these actions on his own without instruction or knowledge of Daprizio. Nevertheless, this necessitated complete modification of the internal financials and delayed the finalizing of the year-end financial statement due for the renewal to be considered in May 2004.

When the 2003 year-end financial statement was completed, Daprizio made a proposal to Plaintiff as the financials reflected that Sawgrass was in default in its covenants in the

-12-

ADV. NO.: 05-2094-RBR

loan documents though it continued to make payments on the loans. The proposal of June 2004, was rejected by Merrill Lynch and the loans were called in the end of June 2004. Thus, there was no renewal or extension of credit made based upon the 2003 year-end financial statement of Sawgrass given to the Plaintiff in May 2004.

As a result of the Plaintiff's refusal to renew Sawgrass' loans, Sawgrass commenced a state court Assignment for the Benefit of Creditors ("ABC") proceeding in mid-July 2004. The business ceased operation once the ABC was commenced and the assets were turned over to the assignee.

## Assignment for the Benefit of Creditors

The Assignee, Larry Hyman of Moecker & Associates, Inc. ("Moecker") took control of the assets of Sawgrass on July 13, 2004. Hyman was appointed due to his relationship with Merrill Lynch on other matters. Sawgrass was closed and the employees were ordered to leave the premises. Hyman delegated the handling of the ABC to the local Moecker employees. Philip Von Kahle ("Von Kahle") was generally the person who handled the day to day operation of the ABC.

Von Kahle had visited Sawgrass' premises in May 2004, in anticipation of Moecker's hiring in the event the ABC was filed if a workout could not be reached with Sawgrass' creditors. At that time Von Kahle stated he observed a higher level of inventory in May 2004 than what he later observed in July 2004, but he could not state the cause of the reduction. The operation of Sawgrass continued through the date of the assignment and he confirmed there was collection of receivables at least to the extent of $750,000.00 for the forty-five-day period prior to the commencement of the ABC.

-13-

ADV. NO.: 05-2094-RBR

Von Kahle, when questioned by the Court as to whether an inventory was taken in July 2004, stated that no physical inventory was conducted but he and others did a spot inventory to confirm that the inventory was consistent with the inventory listing provided by Sawgrass. Thus, Von Kahle apparently determined there was no material discrepancy between the inventory records provided and what was received. There was no evidence that any reduction in inventory from May 2004 to July 2004 was caused by any action of the Defendant other than what would have been utilized in Sawgrass's operation.

The accounts receivables were less than expected for which there was little explanation. Daprizio said he utilized the records of Sawgrass but that it was unclear whether the posting of more than $750,000.00 from all of the collections were, in fact, posted up to date at the time of the filing of the ABC. There was no accounting or clarification as to whether these were posted to the accounts receivable list or not. Defendant asserted that neither the assignee nor Plaintiff properly attempted to collect on the receivables. Nevertheless, there was no evidence that Daprizio converted any receivables for his benefit. In fact, both Daprizio and Velardi affirmatively stated they believed the receivable list was accurate and believed the receivables were collectible.

There was no showing that Daprizio did anything other than having the bookkeeping department printout and submit the list of assets of Sawgrass to the state court in support of the ABC. There is no evidence that Defendant took any action to modify, inflate or misrepresent the assets of Sawgrass or the business records Sawgrass' bookkeeping department maintained in it operation. No action was taken by the assignee or Plaintiff against the Defendant alleging any fraud in the ABC proceeding, nor did the Plaintiff allege

-14-

ADV. NO.:  05-2094-RBR

any fraud against the Defendant in the collection action it initiated against the Defendant

state court in 2004.

## Disbursements to Defendant

The tax return of Sawgrass for year-end 2002 reflected ordinary net income of

$600,983.00.   The total net worth of Sawgrass on December 31, 2002 was $432,910.00.

The Defendant received a K-1 from Sawgrass for the $600,983.00.  Defendant left

the profit in the company and took periodic distributions in 2003, on his belief that he was

entitled to the distribution of the profit from the company.  Consistent with this belief,

Daprizio took disbursements, including those for the purchase of property in Colorado and

for other personal expenses.  He believed that he could take this profit on which he had

paid tax.  Also, consistent with his understanding, Daprizio made charges on his charge

cards for both personal and business expenses which would be reconciled at year-end and

his income adjusted in accordance with the personal expenses paid, in light of the profit

and distributions attributable to him under the K-1 he had received and the income he was

due.  The Court does not find these actions fraudulent but a customary handling of

disbursements to a shareholder in a privately held sub-chapter S corporation.

## Conclusions of Law

### Federal Rule of Bankruptcy Procedure 7052(c)
### Does Not Require a Court to Hear Rebuttal Testimony

The general rule is that "the decision to permit rebuttal testimony is one that resides

in the sound discretion of the trial judge".  *See United States v. Gold*, 743 F.2d 800, 818

(11th Cir. 1984)(citing *Geders v. United States*, 425 U.S. 80, 86 (1976)).  Furthermore,

"[r]ebuttal evidence is properly admissible when it will explain, repel, counteract or disprove the evidence of the adverse party." *Finizie v. Principi*, 69 Fed. Appx. 571, 574 (3rd Cir. 2003)(quoting *United States v. Chrzanowski*, 502 F.2d 573, 576 (3d Cir. 1974)). Daprizo has not offered any evidence, as procedurally, the motion for involuntary dismissal was brought at the close of the Merrill Lynch's case. Therefore, denial of rebuttal evidence is not improper, as there is no evidence to rebut. The same conclusion is reached upon examination of Fed. R. Bankr. P. 7052(c) and the cases cited to by Merrill Lynch.

Bankruptcy Rule 7052(c) does not require a court to hear rebuttal testimony in determining whether Plaintiff has presented sufficient evidence to support its claims. Merrill Lynch argues that the Court is precluded from granting Daprizio's Motion for Involuntary Dismissal under Rule 7052(c) because it has not been permitted to call rebuttal evidence. In support of its claim, Merrill Lynch relies upon *CMS Software Design Sys., Inc. v. INFO Designs, Inc.*, 785 F. 2d 1246 (5th Cir. 1986)[3]. However, neither Bankruptcy Rule 7052(c) nor *CMS Software Design* require a court to hear rebuttal evidence prior to ruling on a motion for involuntary dismissal.

Bankruptcy Rule 7052(c), which incorporates in full FED., R. CIV. P. 52(c), states that

> "[i]f during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim, that cannot under the controlling law be maintained or defeated without a favorable finding on that

---

[3] The Court notes that FED. R. CIV. P. 41(b) (1986) used in the *CMS Software Design Sys., Inc.*, decision is very similar to the current FED. R. CIV. P. 52(c). *Compare CMS Software Design Sys., Inc.*, 785 F. 2d at 1248, *with* FED. R. CIV. P. 52(c).

ADV. NO.:  05-2094-RBR

issue, or the court may decline to render any judgment until the close of all evidence."

In this case, Daprizio has asked the Court to apply its discretion to dismiss Merrill Lynch's claims for nondischargeability because after Merrill Lynch's case in chief, where it was fully heard on the merits of its claims over a thirteen day period, Merrill Lynch failed to present sufficient evidence to support the necessary elements of its claims. There is nothing in the text of Rule 52(c), that would require the Court to hear rebuttal testimony.

In *CMS Software*, the court stated that an involuntary dismissal may be granted in two situations, (1) where the plaintiff fails to prove a *prima facie* case against the defendant, or (2) the plaintiff's own evidence proves the defendant's affirmative defense. *CMS Software Design Sys., Inc.,*785 F. 2d at 1248.  In *CMS Software*, the issue was whether dismissal was appropriate where the defendant's affirmative defense was proven through the plaintiff's case and where plaintiff, who reserved the right to call rebuttal witnesses, was denied that right prior to the court granting the defendant's dismissal. *See id* at 1248 (noting "the trial court dismissed [the] case on the latter ground").

Daprizo has sought dismissal under the first scenario, namely, that Merrill Lynch has failed to prove its case. This is different from *CMS Software*, where dismissal was predicated on the Plaintiff inadvertently proving an affirmative defense. *See CMS Software Design Sys., Inc.,*785 F. 2d at 1248 (condemning dismissal in favor of the party "bearing the burden of proof before the opposing party was given an opportunity to rebut."). As such *CMS Software* is clearly inapplicable to this case. Daprizo did not seek dismissal because Merill Lynch proved one of his affirmative defenses. Rather, the motion seeks dismissal

-17-

ADV. NO.:  05-2094-RBR

because Merrill Lynch has failed to sustain its burden of proof. Furthermore, the dismissal here is being given against the party with the burden of the evidence, which is the opposite of *CMS Software*. Therefore, *CMS Software* is inapplicable to this case.

The Court concludes, in light of the foregoing authority, that rebuttal testimony is not required or needed to determine whether Plaintiff has sustained its burden of proof as to all elements required under the remaining counts of its complaint.

### Count I Under Section 523(a)(2)(A)

Under Count I, Plaintiff requests this Court to determine its debts to be non-dischargeable under 11 U.S.C. § 523(a)(2)(A).  To prevail under 11 U.S.C. § 523 (a)(2)(A), the Plaintiff must establish that: (1) Defendant made a false representation with the purpose and intention of deceiving Plaintiff; (2) Plaintiff relied upon the Defendant's representation; (3) Plaintiff's reliance on the false representation was justifiably founded; and, (4) Plaintiff was damaged as a result of the false statement. *See  Schweig v. Hunter (In re: Hunter)*, 780 F.2d 1577, 1759 (11th Cir. 1986); *Citizens National Bank v. Hunter, (In re Hunter)*, 229 BR. 851, 858-59 (Bankr. M.D. Fla 1999); *In re Vickers*, 247 B.R. 530, 534 (Bankr. M.D. Fla. 2005).

There must be an actual or overt false pretense or representation to come within the exception. *Schweig v. Hunter (In re: Hunter)*,  780 F.2d ,1580.  Plaintiff bears the burden of proving the above elements by a preponderance of the evidence.  *Grogan v Garner*, 498 U.S. 279, 291, 11 S. Ct. 654, 112 L Ed. 2d 755 (1991).  The Court will strictly construe the exceptions to discharge against the creditor and liberally in favor of the debtor.  *In re Baker*, 298 B.R. 815, 818 (Bankr. S.D. Fla. 2003).

ADV. NO.:  05-2094-RBR

Section 523(a)(2)(A) deals with situations other than those which deal with statements respecting a debtor's or an insider's financial condition. The two paragraphs (A) and (B) of section 523 (a)(2) are mutually exclusive. *In re Bratcher* 289 B.R. 205, 214 (Bankr. M.D. Fla. 2003).

Plaintiff's evidence fails to prove either, (1) an actual fraud, or, (2) an actual or overt false representation or pretense, on the Defendant's part at the time the Plaintiff entered into the agreement or extended the renewal. None of the witnesses at trial testified as to any specific overt and actual material false representations made by the Defendant, let alone representations made by Defendant with the intent and purpose of deceiving the Plaintiff. None of Plaintiff's witnesses including Michael Kozak[4], testified that they knew of any overt false statements or misrepresentation that the Defendant made to the Plaintiff. Thus, where the Plaintiff cannot show that at the time of the loans' inception or renewal that the Defendant misrepresented his intentions or ability to pay, the first element of 523(a)(2)(A) cannot be met. See *In re Corley,* 341 B.R. 792, 797 (Bankr. M.D. Fla. 2006)(denying a determination of non-dischargeability where the Plaintiff failed to prove the debtor obtained services by false representation, false representation or actual fraud).

In addition to the above failure, there was a lack of evidence to support the other elements, including any proof of damage caused as a result of any actual and overt intentionally false misrepresentation of the Defendant.

---

[4] Kozak was the Plaintiff's designated as the corporate representative with the most knowledge as to the allegations in the complaint and the person who approved the last loan and renewal of loans for Sawgrass.

-19-

ADV. NO.: 05-2094-RBR

The Plaintiff alleged that the Defendant created an entity known as Infinity, but the evidence established that this entity never got off the ground. It was basically a shell company that had an account with Merrill Lynch, and there was no evidence that the Defendant did anything with this company that was fraudulent or damaged the Plaintiff.

Plaintiff alleged that the Defendant took trips to China, did business with Sportspower, and Sawgrass paid Sportspower. However, no credible evidence was submitted to establish how Defendant's sales trips to China were fraudulent and/or how payments to Sportspower (which was a major supplier) were fraudulent.

Defendant's Wife provided some testimony regarding some alleged overpayments but the Court does not find her testimony credible or consistent because of her limited involvement with Sawgrass, and her bias and prejudice against her ex-husband, the Defendant.

Plaintiff complains that a UCC 1 was signed in favor of Sportspower in March of 2004. However, the UCC 1 was not fraudulent, it apparently was Sawgrass' attempt to keep in good standing with a major supplier. Further, it is clear that there was a debt owing to Sportspower and the filing of an inferior UCC 1 had no effect on the superior lien of Plaintiff. Moreover, Sportspower took no action relative to its unperfected lien either against the Plaintiff or its collateral.

Plaintiff alleged that in the Defendant's divorce proceeding allegations were made by Defendant's former Wife that he transported vast sums of monies to Hong Kong. This was never established either in the divorce action where two forensic accountants were employed, or by the Plaintiff in this action. The only evidence as to monies being sent to

-20-

Hong Kong was in payment to a supplier and the payments were not concealed but made through Sawgrass' accounts with Plaintiff.

In view of the foregoing, the Court finds there was no actual or overt misrepresentations made by the Defendant to the Plaintiff at the inception of the loans or the renewal thereof.

Further, the law is clear that in order for a 11 U.S.C. §523(a)(2)(A) action to be successful the misrepresentation must have occurred and been relied upon at the time the loan was extended or renewed. *See ITT Fin. Servs. v. Hulbert,* 150 B.R. 169 ,175 (Bankr. S.D. Tex. 1993)(holding that "fraud must exist "at the inception of the debt."); *In re Ethridge,* 80 B.R. 581, 587 (Bankr. M.D. Ga. 1987); *In re Cokkinias,* 28 B.R. 304, 307 (Bankr. D. Mass. 1983). Consequently, Plaintiff cannot rely on allegations of Daprizio's behavior or representations after the inception or the renewal of the loans, because it could not have relied on such actions or representations when initiating the loan or renewing it. The Court thus concludes that the Plaintiff has failed to establish the second element. There was no evidence that at the time of the inception of the loan or at the renewals that there was any false pretenses, a false representation, or actual fraud that was relied upon by Plaintiff.

Consequently, in view of the foregoing, including the admissions of Plaintiff's witness, Michael Kozak, and the lack of proof as to the elements necessary for Plaintiff's case under Section 523(a)(2)(A), Count I will be dismissed.

### Count II Under Section 523(a)(2)(B)

Under Count II Plaintiff requests this Court to deny the dischargeability of its debts under Section 523(a)(2)(B) of the Bankruptcy Code.  This code exception to discharge is

ADV. NO.: 05-2094-RBR

limited in scope to fraud relating to a financial condition of a debtor or an insider of a debtor.

In order to prevail under this exception, Plaintiff must prove the debt was obtained: (1) by a statement in writing which is materially false; (2) representing the Debtor's or an insider's financial condition; (3) on which the creditor reasonably relied and; (4) the Debtor caused the writing to be made or published it with the intent to deceive. 11 U.S.C. § 523(a)(2)(B); *Equitable Bank v. Miller (In re Miller)*, 39 F. 3d 301, 304 (11th Cir. 1994). The Plaintiff has the burden of proving all of the elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L. Ed. 2d 755 (1991); *Equitable Bank v. Miller (In re Miller)*, 39 F. 3d 301, 304 (11th Cir. 1994). The controlling law is clear if any of the elements of the section are not met, the debt is dischargeable. *Equitable Bank v. Miller (In re Miller)*, 39 F. 3d 301, 304 (11th Cir. 1994).

Therefore, the focus of this exception is solely on the financial statements dealing with the Defendant and that of the corporate borrower, Sawgrass. As for the Defendant's financial statements, there has been no proof that his personal financial statements were false, therefore the Plaintiff has not made any case as it relates to that issue. Turning to the issue of Sawgrass's financials.

In order to meet the first element, material falsity, "mere inaccuracy" is insufficient. *Master Fin., Inc. v. DeJulio (In re DeJulio)*, 322 B.R. 456, 461 (Bankr. M.D. Fla. 2005). The circumstances surrounding the corporate financial statements are important. The last renewal and granting of new credit was on May 16, 2003. At the time the Plaintiff granted the renewal of the original line of credit and a new $500,000.00 reducing revolver line of credit, it did so without having the corporate and personal financials in hand.

-22-

ADV. NO.: 05-2094-RBR

In fact, the financials were not received by the Plaintiff until some weeks later. The financials that were required were the year-end 2002 reviewed financial statements of Sawgrass which David Wrubel, C.P.A., P.A. prepared with the assistance of the bookkeeping department of Sawgrass and Donaldson the CFO. The Defendant did not prepare the corporate financial statements, and there was no evidence that the Defendant either influenced or instructed the accountants as to how the financial statements were to be prepared.

In fact, the evidence presented is consistent with the Defendant's testimony that he had little to do with the preparation of the written financials and that he relied upon his staff and particularly Donaldson and his bookkeeping department to handle those matters because his focus was and had been to increase sales-in the business. This is consistent with a business doing more than $12,000,000.00 in gross sales in 2003 with costs of goods in excess of $10,000,000.00. The company employed a full accounting department with an outside accountant preparing and reviewing tax returns and financial statements.

Consequently, there is no credible evidence that at the time of the renewal the Defendant caused the financials to be prepared or published in a manner with an intent to deceive the Plaintiff.

There was a lack of evidence that the year-end reviewed 2002 financial statement, which was given to the Plaintiff after the renewal and revolving credit line was approved in May 2003, was false or inaccurate. Actually most of the Plaintiff's allegations in the complaint and evidence presented as to Count II dealt with events post-May 2003 after the renewal and credit was granted which are not material or relevant to what is required of

-23-

ADV. NO.: 05-2094-RBR

Plaintiff to meet it burden of proof under Section 523(a)(2)(B).   The financial information

given to Plaintiff relating to the May 2003 renewal and granting of credit was not false or

misleading.

The Plaintiff has also failed to establish reliance upon any of the financial information

as it relates to the 2002 year end statement since it was provided after the loan was

approved and the renewal was granted. The Plaintiff argued that certain litigation was not

disclosed by the Defendant which was pending.  However, the reviewed financial statement

does state that there was pending litigation and Sawgrass' management, based upon

opinion of outside counsel, did not believe it would materially affect the financial status of

the company.  Plaintiff was clearly put on notice of pending litigation but no evidence was

presented as to whether the Plaintiff inquired of same or did anything with the financial

statement other than put it in the file. I find that Plaintiff did not rely upon the financial

statements given to it in the May 2003 renewal and granting of the new reducing revolver

line of credit.

Similarly, as to the previous financial statements which Sawgrass provided in support

of the earlier years, there is insufficient evidence to find they were materially false or were

caused by Defendant to be made or published with the intent to deceive, to support a denial

of discharge under 11 U.S.C. § 523(a)(2)(B).

Plaintiff, during trial, and contrary to the allegations in its complaint argued a new

theory that the signing of every check which drew down the line of credit after the renewal

and granting of the loan was a misrepresentation.  The signing of checks or making draws

on the line of credit, are not written financial statements of the Defendant or Sawgrass as

-24-

ADV. NO.:  05-2094-RBR

defined under Section 523(a)(2)(B) and does not qualify as a basis for relief under this count.  Additionally, the new theory being advanced by the Plaintiff at this late date fails to establish the other elements under Section 523(a)(2)(B) which Plaintiff must prove.

In summary, the Court concludes that Daprizio did not obtain money, or an extension, renewal or refinancing of credit from Merrill Lynch by using a statement in writing that is materially false respecting the Defendant's or an insider's financial condition on which the Plaintiff, to whom the Defendant is liable for such money, or credit, reasonably relied which Defendant caused to be made or published with the intent to deceive.

In view of the lack of evidence to support the necessary elements of this exception, Count II will be dismissed.

### Count III Under § 532(a)(4)

Count III of Plaintiff's complaint seeks a determination of dischargeability of debt under 11 U.S.C. § 523(a)(4).  Under this section, in order for the Plaintiff to recover it must prove "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." *See* 11 U.S.C. §523(a)(4). This requires the establishment of an express or technical trust which existed between the parties. *Guerra v. Fernandez-Rocha (In re Fernandez-Rocha)*, 451 F.3d 813, 816 (11th Cir. 2006)(stating "the term 'fiduciary' is not to be construed expansively, but instead is intended to refer to 'technical' trusts."); *American Surety & Casualty Co. v. Hutchinson (In re Hutchinson)*, 193 B.R. 61, 65 (Bankr. M.D. Fla. 1996); *Kapila v. Talmo (In re Talmo)*, 175 B.R. 775,777-78 (Bankr. S.D. Fla. 1994). An express or technical trust exists when there is a segregated trust *res*, a identifiable trust beneficiary,

ADV. NO.: 05-2094-RBR

and trust duties established by contract or statute. *Cardile Bros. Mushroom Pkg., Inc. v. McCue (In re McCue)*, 324 B.R. 389, 392 (Bankr. M.D. Fla. 2005).

Plaintiff failed to prove the existence of an express or technical trust which is a necessary element to its case under this exception to discharge. In *In re Talmo,* the court held that failure to establish the narrowly defined federal definition of fiduciary capacity was fatal to a 11 U.S.C. §523(a)(4) action. *See Kapila v. Talmo*, 175 B.R. at 778. In the instant case all of the Plaintiff's witnesses, who were once employees of the Defendant, confirmed under cross-examination that there was no express trust with the Defendant.

The Plaintiff's complaint alleges that by virtue of the Defendant's mere holding of a corporate office as an officer or director that a fiduciary capacity sufficient for Section 523(a)(4) was created. This is contrary to controlling law. This exact argument was rejected by Judge Mark in *Kapila v. Talmo,* the trustee had argued that "corporate officers and directors owe a fiduciary duty to the corporation and its creditors under Florida statutory and common law." *Kapila v. Talmo*, 175 B.R. at 777. Judge Mark, determined that such duties do not meet the narrow definition of fiduciary for §523(a)(4) purposes and accordingly granted summary judgment in favor of the defendant. *See id* at 778.

Even if the Plaintiff had proved an express or technical trust, it failed to prove a defalcation while acting in a fiduciary capacity. *Guerra v. Fernandez-Rocha (In re Fernandez-Rocha)*, 451 F.3d at 817(noting that if there was a fiduciary relationship then the examination moves to "whether there was a defalcation while acting in a fiduciary capacity")(internal quotations and citations omitted); *Quaif v. Johnson*, 4 F.3d 950, 955 (11th

-26-

ADV. NO.:  05-2094-RBR

Cir. 1993)(noting "'[d]efalcation' refers to a failure to produce funds entrusted to a

fiduciary")).  Here, there has been no evidence that this Defendant personally benefitted at

the expense of a beneficiary for whom he was holding a segregated *res* in trust.

Under Section 524(a)(4), Plaintiff also alleged that Defendant committed larceny.

Larceny is defined as "the fraudulent and wrongful taking and carrying away the property

of another with intent to convert such property to his use without the consent of the owner."

*Faw v. Wiles (In re Wiles),* 166 BR. 975, 980 (Bankr. M.D. Fla 1994)(citations omitted). The

Plaintiff has failed to prove that Defendant with fraudulent intent took property of the

Plaintiff.  Thus, Count III will be dismissed.

Consequently, this Court, will enter a separate final judgment dismissing Plaintiff's

complaint with prejudice.  This Court will retain and reserve jurisdiction to determine the

awarding of attorney's fees and costs.

# # #

**Copies furnished:**
Reggie David Sanger, Esquire
Attorney for the Defendant

Cheryl Thompson, Esquire
Stephenie M. Biernacki, Esquire
John Anthony, Esquire
Attorneys for the Plaintiff